## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SHARDAE B.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No. 3:24-CV-287-MAB[2]** |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Shardae B. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision is REVERSED and this matter is REMANDED for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Plaintiff protectively filed a Title II application for a period of disability and DIB on January 14, 2021 (Tr. 30, 126-127). Plaintiff also filed a Title XVI application for SSI on

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c) (Doc. 26).

that date (Tr. 30, 126-127). Plaintiff's applications both alleged disability beginning on January 1, 2021, due to physical and mental conditions including multiple sclerosis ("MS"), dizziness, balance issues, trouble walking, fatigue, and depression (*see, e.g.* Tr. 262, 305).

Plaintiff's applications were initially denied in August 2021 (Tr. 30, 126-127). They were then denied upon reconsideration in December 2021 (Tr. 30, 164-165). Plaintiff requested a rehearing by an Administrative Law Judge (ALJ) (*see* Tr. 177-178), which occurred on October 19, 2022 (Tr. 49-100). Following the hearing, ALJ Brian Battles issued an unfavorable decision dated March 9, 2023 (Tr. 30-42). Thereafter, Plaintiff's request for review was denied by the Appeal's Council and thus, the ALJ's decision became the final agency decision (Tr. 1-6). Accordingly, Plaintiff exhausted her administrative remedies and filed a timely complaint in this Court seeking judicial review of the ALJ's adverse decision (Doc. 1).

### APPLICABLE LEGAL STANDARDS

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). The first step is to determine whether the claimant is presently engaged in substantial gainful activity. *Id.* at § 416.920(a)(4)(i). If the answer is yes, then the claimant is not disabled regardless of their medical condition, age, education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no and the individual is not engaged in substantial gainful activity, the analysis proceeds to the second step. *Id.* at § 416.920(a)(4).

At step two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At step three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 416.920(e).

An individual's RFC is his or her ability do work despite the individual's impairments. *Id.* at § 416.945; *see also Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) ("RFC is the maximum that a claimant can still do despite his mental and physical limitations."). "In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record and provide a 'narrative discussion' that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and '[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.'" *Passig v. Colvin*, 224 F. Supp. 3d 672, 680 (S.D. Ill. 2016) (quoting SSR 96-8).

At step four, the ALJ must determine whether the claimant retains the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the final step. *Id.* at § 416.920(a)(4).

At the fifth and final step, the ALJ must consider whether the claimant can make an adjustment to perform any other work considering the claimant's RFC, age, education, and work experience. *Id.* at § 416.920(a)(4)(v). If the claimant can make an adjustment to other work, then the claimant is not disabled. *Id.* at § 416.920(g). Conversely, if the claimant cannot, then the claimant is disabled. *Id.*

Notably, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). This Court's task is not to determine whether Plaintiff was, in fact, disabled at the relevant time, but instead to determine whether the ALJ's

findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Id.* (internal citations omitted).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is presented in mostly chronological order and directed to the points and factual allegations raised by Plaintiff.

I.    *Relevant Medical Records:*

Plaintiff alleges her disability began on January 1, 2021 (*see, e.g.*, Tr. 255). Several years earlier in late 2017, Plaintiff began experiencing dizziness (Tr. 491). As a result,

Plaintiff underwent an MRI in January 2018, which showed findings consistent with multiple sclerosis ("MS") (Tr. 491, 493). In March 2020, an MRI of Plaintiff's brain showed "at least 6 new areas of abnormal T2 FLAIR hyperintense supratentorial white matter signal." (Tr. 449). Additionally, in comparison to Plaintiff's MRI from 2018, her 2020 MRI showed "multiple new supratentorial, infratentorial, and spinal cord lesions" and the "lesion at C2 demonstrated fairly faint gadolinium enhancement." (Tr. 449). Thereafter, Plaintiff had a telemedicine visit with Dr. Tullman in July 2020 (Tr. 449). Plaintiff reported that her balance remained impaired, numbness in her right hand was persisting, and she felt forgetful (Tr. 449). Plaintiff also stated that she was on the verge of losing her job because of her MS (Tr. 449).

Medical records from January 29, 2021, indicate Plaintiff had not been taking MS medications because she was concerned about side effects (Tr. 437). A neurological examination at that time indicated that Plaintiff was awake, alert, oriented, could follow commands, was able to walk heel and toe without difficulty, but had an abnormal tandem gait (Tr. 434). On February 11, 2021, Plaintiff visited Dr. Tullman (Tr. 446-448). She reported that her balance was worse, and she fell about once every two weeks (Tr. 447). Plaintiff also stated that her right-hand numbness was without change, she struggled with anxiety and depression, had trouble focusing, and relied on her mother and sister for transportation, help around the home, and with her children (Tr. 447). Dr. Tullman's progress notes indicated generally normal examination results, other than a broad-based gait that was mildly paretic and ataxic (Tr. 448).

Plaintiff visited Dr. Tullman again in March 2021, wherein he noted "no new symptoms suggestive of MS exacerbation or gradual disease progression." (Tr. 442). Dr. Tullman also observed that Plaintiff was thirty weeks pregnant at that time and discussed concerns related to an increased risk of MS relapse in the first three months postpartum if MS is left untreated (Tr. 442). Plaintiff returned to Dr. Tullman in August 2021 (Tr. 480). Dr. Tullman's notes discuss Plaintiff's then-recent pregnancy performed by emergency C-section, as well as her postpartum course which was reportedly complicated by acute psychosis with paranoia and auditory and visual hallucinations (Tr. 480). Plaintiff also reported that she was suffering from urinary urgency and had episodes of incontinence every other day (Tr. 480). Dr. Tullman's examination indicated that Plaintiff's immediate recall was intact (Tr. 480). However, she recalled 1 out of 3 objects correctly at 10 minutes and correctly named 11 out of the 12 months backwards, having confused February for July (Tr. 480). Dr. Tullman also found Plaintiff's vibratory sensation was absent at the right hallux and moderately impaired at the left hallux (Tr. 480). Dr. Tullman again noted that Plaintiff's gait was mildly broad-based and mildly paretic and ataxic (Tr. 480).

Another MRI of Plaintiff's brain and brainstem was conducted in September 2021 (Tr. 484). The MRI revealed multiple foci of hyperintensity but did not find new or enhancing lesions (Tr. 485). Plaintiff had another appointment with Dr. Tullman on November 1, 2021, which was documented by PA Wei (Tr. 529-533). At the appointment, Plaintiff and her mother reported that Plaintiff was having additional trouble balancing, was unable to walk straight, had fallen several times, was suffering from cognitive dysfunction and memory problems, was experiencing intermittent dizziness, and

experienced numbness in both hands (Tr. 529). A physical examination found that Plaintiff's immediate recall was intact, but she again recalled 1 out of 3 objects at 10 minutes (Tr. 530). That report also noted Plaintiff's gait was mildly broad-based, and mildly paretic and ataxic (Tr. 530). In addition, the physical examination again found that Plaintiff's vibratory sensation was absent at the right hallux and moderately impaired at the left hallux (Tr. 530).

Plaintiff visited Dr. Rukmangadachar on January 20, 2022 (Tr. 493). Physical examination indicated that Plaintiff's finger and foot taps were slow, and she had a mild wide-based and unsteady gait (Tr. 497). Dr. Rukmangadachar also reported that Plaintiff "has relapse of onset multiple sclerosis and extensive lesion burden and accumulated significant disability." (Tr. 497). Plaintiff had a telemedicine visit with Dr. Tullman in February 2022 (Tr. 527). At that visit, Plaintiff complained of right lower extremity pain and reported that she typically holds onto someone when walking (Tr. 527).

II.     _Disability Determinations and Opinion Evidence_:

At the initial level in July 2021, state agency consultants Dr. Yondell Moore and Disability Adjudicator Padeitra Moorer reviewed the medical records provided to them and noted that Plaintiff had not been seen "in office for the past two years," was never on MS medication, and did not receive recommended injections (Tr. 106). They also found that medical records demonstrated Plaintiff had normal strength in her extremities and could walk heel and toe without difficulty, but she did have gait issues including abnormal tandem station, and a broad based gait that was mildly paretic and ataxic (Tr. 106). Dr. Moore found that Plaintiff's medically determinable impairment of MS could

produce her reported symptoms of pain, weakness, and fatigue, but Plaintiff's statements about intensity, persistence, and functionally limiting effects were not substantiated by the objective medical evidence (Tr. 107). Dr. Moore opined that Plaintiff had exertional limitations including: occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing 6 hours in an 8 hour workday, and sitting 6 hours in an 8 hour workday (Tr. 108). Dr. Moore also found the following postural limitations: occasionally climbing ramps/stairs, ladders/ropes/scaffolds, and balancing, and frequently kneeling, crouching, and crawling (Tr. 109). Dr. Moore did not impose any manipulative, visual, communicative, or environmental limitations (Tr. 109). The initial level state agency consultants ultimately found Plaintiff was not disabled and could conduct light work, based upon the documented findings (Tr. 111, 124-125). Three examples of light work that Plaintiff could perform were: addresser – 209.587-010, ticket taker – 344.667-010, and surveillance system monitor – 379.367-010 (Tr. 112, 124).

At the reconsideration level, State agency consultants considered the medical evidence in the record and opined that Plaintiff's residual functional capacity allowed for: occasional lifting and/or carrying 20 pounds, frequent lifting and/or carrying 10 pounds, standing and/or walking 4 hours in an 8 hour work day, sitting 6 hours in an 8 hour work day, occasional climbing ramps/stairs and balancing, frequent stooping, kneeling, crouching, and crawling, and never climbing ladders/ropes/scaffolds (Tr. 139-141, 157-159). They also found that Plaintiff's MS warranted the environmental limitation that she must avoid concentrated exposure to hazards, including avoiding commercial driving, operating dangerous machinery, uneven terrain, and unprotected heights (Tr.

141-142, 159-160). State agency consultant Dr. Garon found that at the reconsideration
level, additional evidence did not demonstrate a change in Plaintiff's physical condition,
but initial records and the totality of the evidence was only partially consistent with the
initial functional assessment (Tr. 142, 160). Accordingly, at the reconsideration level, state
agency consultants found Plaintiff could work at the sedentary level and therefore, was
not disabled (Tr. 144, 162).

On February 23, 2022, Plaintiff's primary care doctor, Dr. Mazhar Lakho,
completed a physical residual functional capacity evaluation of Plaintiff (Tr. 513-524). Dr.
Lakho indicated that Plaintiff could lift and carry: negligible weight continuously, less
than 10 pounds occasionally, and negligibly lift any weight 10 pounds or over (Tr. 514).
Dr. Lakho then answered "No" to the question of whether Plaintiff could reliably sustain
performance for an 8-hour workday, 40-hour week without having to take unscheduled
breaks, by alternating between sitting, standing and walking (Tr. 515). Dr. Lakho found
that Plaintiff could only perform zero to less than 1 hour of sitting, standing, walking,
and resting/laying down (Tr. 515). Dr. Lakho determined Plaintiff could not ambulate
effectively and requires the use of an assistive device (Tr. 515). Regarding Plaintiff's
hands, Dr. Lakho reported that Plaintiff could occasionally reach, and could frequently
handle, finger, feel, and push/pull with both hands (Tr. 516). Dr. Lakho indicated that
Plaintiff could occasionally use her feet to operate foot controls and he explained that this
limitation was due to Plaintiff's altered gait related to her MS and her inability to walk
without a cane or walker (Tr. 516). Dr. Lakho also reported that Plaintiff had marked
limitations in physical functioning, understanding or remembering/applying

information, interacting with others, maintaining concentration, persistence or pace, and adapting or managing oneself (Tr. 520). Due to her limitations, Dr. Lakho found that Plaintiff met the criteria of listed impairment § 11.09, multiple sclerosis (Tr. 518-519).

On October 19, 2022, Plaintiff's mother submitted an opinion letter wherein she stated that she has to lift Plaintiff up off the couch and help her to the car while Plaintiff puts most of her body weight on her (Tr. 399). She also stated that she must help Plaintiff out of the car and walk with her into the doctor's office in the same manner (Tr. 399). Likewise, Plaintiff's mother wrote that she takes the same steps to help Plaintiff with using the bathtub (Tr. 399).

III.    _Administrative Hearing_:

An administrative hearing was held before ALJ Battles on October 19, 2022 (Tr. 48-100). Plaintiff was represented by Attorney Bradley Bauer and Plaintiff's sister, Jessica Hall, also appeared to assist in providing testimony (Tr. 48). In addition, Vocational Expert Rebecca Kendrick provided testimony classifying Plaintiff's past work (Tr. 95-97).

Plaintiff testified that she lived with her mother in a ground level apartment (Tr. 57-58). However, the apartment had some stairs which caused her trouble on a daily basis (Tr. 58). Plaintiff also reported that she was no longer driving (Tr. 59). Plaintiff discussed her past work as a home healthcare provider and an employee at the United States Postal Service (Tr. 59-61). Plaintiff's counsel then asked Plaintiff why she was sitting leaned forward with her hand on her head and her eyes closed, to which Plaintiff explained that she was tired (Tr. 63). Circling back to the question of stairs, Plaintiff said she had to walk up stairs to both get into the apartment and to use the bathroom, which was on the upper

level of the apartment (Tr. 63). As a result, she indicated she often uses a bedside commode so she does not have to climb the stairs to the bathroom (Tr. 64).

Plaintiff testified that her MS impacted her balance and ability to walk, which caused her to rely upon a walker to get around (Tr. 64-65). She also stated that her memory and ability to concentrate had been impacted by her MS, such that she sometimes had no idea what was going on in conversations (Tr. 65). Plaintiff discussed difficulties she faced in getting up, keeping her balance, and finding comfortable positions in light of pain she experienced (Tr. 66-67). Plaintiff stated that she had lost feeling in her right foot at that point in the hearing (Tr. 67). Plaintiff later testified that her mother did the chores around the house, but she would try to accompany her on trips to the grocery store (Tr. 68-69). Plaintiff said that she had difficulty using her hands, relied upon her mother to do her hair, and needed help tying her shoes (Tr. 71).

While Plaintiff's counsel directed several addition questions to Plaintiff, her responses became less coherent and counsel became concerned that she was falling asleep (Tr. 70). As a result, Plaintiff's sister, Jessica Hall, was brought into counsel's office to assist in providing hearing testimony (Tr. 73-74). Ms. Hall stated that she did not live with Plaintiff and typically visited her twice a week after the workday ended (Tr. 75). Ms. Hall indicated that Plaintiff was not allowed to use the stove when their mother was not home, and Plaintiff typically prepared microwave food that their mother had left in the microwave for her (Tr. 76). Ms. Hall stated Plaintiff could not climb the stairs to the bathroom by herself and had significant trouble holding objects (Tr. 76). She also stated

that Plaintiff had to have assistance with sponge baths, putting on clothes, and tying her shoes (Tr. 76-77).

As to Plaintiff's memory, Ms. Hall said Plaintiff had become very forgetful and provided several examples of her memory issues and struggles to fully understand conversations (Tr. 77-78). Ms. Hall also indicated that she thought Plaintiff would have trouble holding a job because: (1) she would have transportation issues getting there; (2) she lacked the mental capacity and concentration to work full shifts; (3) she suffers from frequent fatigue, (4) she experiences incontinence and requires assistance in changing her diapers; and (5) she deals with balance, dizziness, and vertigo issues (Tr. 78-83). The ALJ then asked Ms. Hall why Plaintiff's current presentation appeared substantially worse than how she appeared to present herself on telehealth appointments (Tr. 85). Ms. Hall responded that Plaintiff was appearing today as she usually does (Tr. 85). Likewise, the ALJ asked Ms. Hall why the medical records did not discuss Plaintiff's reliance on a walker when her hearing testimony was that she always used it (Tr. 86). Ms. Hall responded that Plaintiff always relied upon her walker when they were together, but Ms. Hall admitted that Plaintiff's mother was the one who typically took Plaintiff to her doctors' appointments (Tr. 86-89).

The ALJ then asked counsel to help him understand the "disconnect between portions of the record" and "what has gone on in the last hour and 15 minutes." (Tr. 91). Counsel indicated additional records were forthcoming and that he personally observed Plaintiff's condition deteriorate over the last year and a half (Tr. 93). The ALJ then

discussed the question of how Plaintiff's alleged onset date had been determined and stated that:

> If the claimant chooses not to [amend her alleged onset date], I've got no problem with that. If it means that that results in a later onset versus a fully favorable, versus an unfavorable, none of that really matters to me because the end result is an additional three hours of work and I'm never going to put – you know, I'm never going to call into question anything about these hearings by trying to give the impression that there was almost like a quid pro quo. Again, I know – I'm not suggesting you did that, but I just want to make sure that I'm crystal clear about that.

(Tr. 94-95).

Thereafter, Vocational Expert Rebecca Kendrick was called to provide testimony as to Plaintiff's past work (Tr. 95). Based upon the testimony and record, Ms. Kendrick classified Plaintiff's past home health care job as a home health aide, DOT code 354.377-014, which was medium work as generally performed and as Plaintiff had actually performed (Tr. 97). Plaintiff's post office job was classified as a mail clerk, DOT code 209.687-026, which was light work as generally performed but medium work as actually performed by Plaintiff (Tr. 97). No questions regarding Plaintiff's past work were posed to Ms. Kendrick, so she was dismissed after the ALJ informed her that "there may or may not be interrogatories in the next 30 to 45 days." (Tr. 97). The ALJ concluded the hearing shortly after (Tr. 99).

## THE ALJ'S DECISION

The ALJ's decision followed the five-step analytical framework described above (Tr. 27-47). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2021, the alleged onset date (Tr. 33). At step two, the ALJ

found Plaintiff had the severe, medically determinable impairment of multiple sclerosis (Tr. 33-34). The ALJ also considered Plaintiff's medically determinable impairment of depression but found that it was nonsevere because it did not cause more than a minimal limitation in Plaintiff's ability to perform basic mental work activities (Tr. 34). In reaching this conclusion, the ALJ found Plaintiff had no limitation in interacting with others and mild limitations in (1) understanding, remembering or applying information; (2) concentrating, persisting or maintaining pace, and (3) adapting or managing oneself (Tr. 34). In making the above determinations, the ALJ reviewed various aspects of the record including Plaintiff's activities of daily living and her ability to dress, bathe, and feed herself independently, to manage her own finances, and to handle stress and changes in routine very well (Tr. 34). Finally, the ALJ also discussed the opinions in the record related to Plaintiff's mental functioning abilities and found that they support a finding that Plaintiff does not have a severe mental medically determinable impairment (Tr. 35).

At step three, the ALJ held that Plaintiff's physical impairments, considered singly or in combination, did not meet or medically equal the criteria of any impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 35). The ALJ specifically indicated that he considered listing 11.09 (multiple sclerosis) and found Plaintiff does not meet that listing because:

> [T]he record, consistent with the findings below, does not demonstrate that the claimant has multiple sclerosis with: (A) disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or using the upper extremities; or (B) a marked limitation in physical functioning and in one of the following: understanding, remembering, or

applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

(Tr. 35).

Before reaching step four, the ALJ formulated Plaintiff's RFC, finding:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally operate foot controls with the bilateral lower extremities. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can occasionally climb ramps and stairs and can never climb ladders, ropes, or scaffolds. The claimant can frequently handle, finger, and reach with the bilateral upper extremities. The claimant can never work in hazardous environments, such as at unprotected heights or around moving mechanical parts. The claimant can understand, remember, and carry out simple instructions in the workplace.

(Tr. 35-36). In reaching this conclusion, the ALJ found Plaintiff's medically determinable impairments could be reasonably expected to cause the alleged symptoms (Tr. 36). However, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 36).

The ALJ then summarized the medical evidence that was presented (Tr. 37-38). He first acknowledged that examinations during the period at issue showed abnormal tandem gait, mildly reduced strength, broad based, mildly paretic and ataxic gait, slow finger and foot taps, unsteady gait, impaired recent memory, and poor attention (Tr. 37). However, he then noted that "examinations also showed that the claimant was in no distress; and exhibited normal strength in the bilateral upper and lower extremities; no

tremor; intact sensation; intact coordination; a normal and steady gait; and no facial weakness." (Tr. 37).

The ALJ then discussed Plaintiff's January 2018 and March 2020 MRIs, which presented findings consistent with MS (Tr. 37). And while the March 2020 MRI showed areas of abnormal T2 FLAIR hyperintense supratentorial white matter signal and new foci of cord signal abnormality, the ALJ emphasized that diagnostics of Plaintiff's brain in September 2021 "showed multiple intracranial white matter lesions compatible with multiple sclerosis, but no new T2 or enhancing lesions compared to her March 2020 diagnostic imaging." (Tr. 37). The ALJ also highlighted the fact that Plaintiff was not on MS medication in either January 2021 or January 2022 (Tr. 37). He further pointed out that the record did not include a prescription for a walker (Tr. 37). He also noted that Plaintiff had no new symptoms suggestive of MS exacerbation in August 2021 (Tr. 37). Consequently, the ALJ concluded that:

> Considering the claimant's abnormal diagnostic imaging of her brain; her physical and mental examinations showing an abnormal tandem gait, an unsteady gait, mildly reduced strength, a mildly paretic and ataxic gait, slow finger taps and foot taps, impaired recent memory, and poor attention; her subjective complaints regarding her symptoms and their impact on her functioning; the testimony of her sister and the information provided by her mother; and her activities of daily living, the undersigned has limited the claimant to work at the light exertional level with the above postural, manipulative, environmental, and mental limitations.

> However, the claimant's stable diagnostic imaging in September 2021; her examinations also showing that she was in no distress, normal strength in her upper and lower extremities, no tremor, intact sensation, intact coordination, a steady gait, and no facial weakness; and her conservative treatment during the period at issue, and periods when she was not adhering to her prescribed treatment, are not consistent with greater or additional limitations. Additionally, while the claimant testified

that she requires the use of a walker, the record indicates that the claimant
was able to walk on her heels and toes without difficulty and she had a
steady gait in January 2021 (Exhibit 1F/17). In February, August, and
November 2021, the claimant's gait was noted to be broad based and mildly
paretic and ataxic, but there was no mention of the use of an assistive device
being required to ambulate (Exhibit 2F/8; 4F/7; 8F/5). In January 2022, the
claimant's gait was noted to be mildly wide based, but, again, there was no
mention of the use of or need for an assistive device, and the claimant's
coordination was normal (Exhibit 5F/7). As such, the undersigned has not
allowed for the use of an assistive device.

(Tr. 37-38).

The ALJ also analyzed the opinion evidence in the record when formulating

Plaintiff's RFC (Tr. 38-40). The ALJ found the opinions of the initial level state agency

consultants to be somewhat persuasive (Tr. 38). Specifically, he found their opinions were

supported by the medical records and Plaintiff's subjective complaints, but he then

imposed greater postural, manipulative, environmental, and mental limitations,

explaining that:

The claimant's abnormal diagnostic imaging of her brain, but stable
diagnostic imaging in September 2021; her physical and mental
examinations showing both an abnormal tandem gait, an unsteady gait,
mildly reduced strength, a mildly paretic and ataxic gait, slow finger taps
and foot taps, impaired recent memory, and poor attention, as well as that
she was in no distress, normal strength in her upper and lower extremities,
no tremor, intact sensation, intact coordination, a steady gait, and no facial
weakness; her conservative treatment and lack of adherence to her
prescribed treatment; the testimony of her sister and the information
provided by her mother; her subjective complaints; and her activities of
daily living are consistent with a limitation to light work with the above
postural, manipulative, environmental, and mental limitations (Hearing;
Exhibit 6E; 8E; 1F/16/17/20; 2F/2/4/7/8; 4F/7/11; 5F/1/3/7;
8F/4/5/10).

(Tr. 38). The ALJ then considered the opinions of the state agency consultants from the

reconsideration level, finding their opinion was not persuasive (Tr. 38-39). Most

prominently, the ALJ explained that the reconsideration level opinions were not persuasive because they imposed additional limitations in Plaintiff's ability to stand and/or walk (Tr. 39).

The ALJ rejected Dr. Lakho's February 2022 opinion, finding it was not persuasive because Dr. Lakho failed to support such a significant degree of limitation. The ALJ reiterated that Dr. Lakho's opinion was not consistent with the longitudinal record because, "[a]s discussed above, the claimant's diagnostic imaging; her normal and abnormal physical and mental examinations; her conservative treatment and lack of adherence to her prescribed treatment; the reports of her sister and mother; her subjective complaints; and her activities of daily living are consistent with a limitation to light work with the above postural, manipulative, environmental, and mental limitations." (Tr. 39).

The ALJ also considered the opinion letter submitted by Plaintiff's mother, finding the degree of limitation in her report was not "fully consistent with the objective medical evidence during the period under review." (TR. 39-40). The ALJ then stated, "As discussed above, the claimant's diagnostic imaging; her normal and abnormal physical and mental examinations; her conservative treatment and lack of adherence to her prescribed treatment; the reports of her sister and mother; her subjective complaints; and her activities of daily living are consistent with a limitation to light work with the above postural, manipulative, environmental, and mental limitations." (Tr. 40).

Finally, the ALJ summarized his RFC findings by explaining that his assessment was supported by the medical evidence of record and accommodated for Plaintiff's impairments by limiting her to light work with additional postural, manipulative,

environmental, and mental limitations (Tr. 40). However, "[b]ecause the claimant's allegations are not fully consistent with the evidence of record, no other limitations are warranted." (Tr. 40).

At step four, the ALJ relied upon the Vocational Expert's testimony to conclude that Plaintiff is unable to perform past relevant work as actually or generally performed (Tr. 41). Lastly, at step five, the ALJ again relied upon Ms. Kendrick, the Vocational Expert, stating, "[t]he Vocational Expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as: Merchandise marker, 209.587-034[;] Cleaner, housekeeping, 323.687-014[;] Routing clerk, 222.687-022[.]" (Tr. 41). The ALJ then confirmed that the Vocational Expert's testimony was consistent with the Dictionary of Occupational Titles and held that "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 41-42). For this reason, the ALJ found Plaintiff was not under a disability, as defined by the Social Security Act, for the period from January 1, 2021, through the date of the ALJ's decision (March 9, 2023) (Tr. 42).

<u>ISSUES RAISED BY PLAINTIFF</u>

Plaintiff raises the following issues (*see* Doc. 21):

1. The ALJ failed to fully and fairly develop the record and issued a decision knowing there was outstanding medical evidence.
2. The ALJ did not properly consider opinion evidence in accordance with 20

C.F.R. § 404.1520c.
3. The ALJ did not properly evaluate Plaintiff's complaints of pain in accordance with SSR 96-3p.
4. The ALJ failed to properly consider Plaintiff's non-compliance with treatment in accordance with SSR 96-7p.

## DISCUSSION

Plaintiff challenges the ALJ's decision on several grounds. First, Plaintiff contends the ALJ erred by failing to fully and fairly develop the record because the record was missing key files related to Plaintiff's mental health impairment and a motor vehicle accident (Doc. 21 at p. 3). Second, Plaintiff contends the ALJ improperly weighed opinion evidence and failed to explain his reasoning by frequently grouping numerous, inconsistent factors together to support his RFC determination without any further explanation or elaboration (*Id.* at pp. 3-9). Third, Plaintiff avers that the ALJ discredited Plaintiff's subjective complaints of pain and limited mobility by relying on evidence of Plaintiff's daily activities, without explaining how those activities undermined Plaintiff's credibility (*Id.* at pp. 9-13). And fourth, Plaintiff contends that the ALJ failed to properly consider Plaintiff's reasons for her noncompliance with treatment and/or lack of treatment when relying upon that noncompliance to determine Plaintiff's credibility and RFC (*Id.* at pp. 13-15). Ultimately, while the Court will discuss several of the arguments raised by Plaintiff, the Court finds that this matter must be remanded for a different reason – that the record does not contain the testimony of the Vocational Expert which was relied upon by the ALJ at Step Five of his decision.

Significantly, as far as the Court can discern, Vocational Expert Rebecca Kendrick only testified at the October 19, 2022, hearing as to Plaintiff's past work (*see, e.g.*, Tr. 95-

97). However, in addition to inaccurately stating that Vocational Expert Roxanne Benoit testified at the hearing (*see* Tr. 30), the ALJ's decision acknowledged that Ms. Kendrick was sent a vocational interrogatory that inquired as to Plaintiff's ability to perform any unskilled occupations that exist in the national economy considering Plaintiff's hypothetical RFC (*see* Tr. 401-405) (Exhibit 18E). Ms. Kendrick purportedly provided her interrogatory answers in Exhibit 19E (*see* Tr. 407-411) (Exhibit 19E) and they were provided to Mr. Peter Drummond, Plaintiff's counsel at the time, who was given an opportunity to submit written questions to Ms. Kendrick (Tr. 413-414) (Exhibit 20E).

While such an approach would be acceptable under normal circumstances, the record currently before the Court does not demonstrate normal circumstances. In addition to originally misidentifying the Vocational Expert (Tr. 30), the ALJ's opinion elaborates upon the process of sending a vocational interrogatory to Ms. Kendrick and states that because Plaintiff did not respond to Exhibit 20E's notice, "the evidence was entered into the record as Exhibit 16E." (Tr. 31). Unquestionably, however, Exhibit 16E does not contain Ms. Kendrick's vocational interrogatory answers. Instead, Exhibit 16E is a one-page letter submitted by Plaintiff's mother (Tr. 399).

Presumably, the ALJ intended to cite to Exhibit 19E, which is labeled, "Response to Vocational Interrogatory, dated 12/06/2022, from VE: Rebecca Kendrick." (Tr. 407-411; *see also* Doc. 12-1 at p. 3). Yet, Exhibit 19E includes the same interrogatories found in Exhibit 18E and ***does not contain any answers or other responses to those questions*** (*Compare* Tr. 401-406 *with* Tr. 407-411). In fact, the only difference between Exhibit 18E and Exhibit 19E is that the final page of Exhibit 19E includes Ms. Kendrick's signature,

dated 12/6/2022 (*see* Tr. 411). Thus, while the Court presumes that there is a version of the vocational interrogatories that contains Ms. Kendrick's responses, neither the ALJ's citation to Exhibit 16E nor the filing found at Exhibit 19E provide a record of such.[4]

And critically, the ALJ indisputably relied upon Ms. Kendrick's vocational interrogatory responses when finding at Step Five that given Plaintiff's RFC, other jobs exist in significant numbers in the national economy (Tr. 41). As such, the Court has no idea what Ms. Kendrick's responses were and whether she considered and/or discussed non-exertional limitations that would impact the range of work Plaintiff could perform. *See, e.g.*, *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) ("[T]his court has said that in cases where a non-exertional limitation might substantially reduce a range of work an individual can perform, the ALJ must consult a vocational expert."); *Wirth v. Barnhart*, 318 F. Supp. 2d 726, 745 (E.D. Wis. 2004) ("[T]his Court cannot conclude that the ALJ's decision to rely exclusively on the Grid Rule as opposed to also basing her decision on a VE's testimony is supported by substantial evidence because the record was not fully and fairly developed, (specifically relevant here are: Dr. Kourakis's diagnosis of chronic pain syndrome, Tr. 318, and the plaintiff's alleged mental disorder, depression, and side effects from medications).").

Furthermore, the Commissioner certified that the transcript provided to the Court "constitute[d] a full and accurate transcript of the entire record of proceedings relating to

---

[4] In fact, the ALJ included a footnote that corrected a DOT code that Ms. Kendrick purportedly provided the wrong number for in her responses (Tr. 41 at fn. 1). Unfortunately, however, that footnote also fails to include any citation to Ms. Kendrick's interrogatory responses.

this case." (Doc. 12).[5] Thus, what the Court is left with is a certified record, wherein the ALJ substantially relied upon Ms. Kendrick's vocational interrogatory responses, but those responses are blank as provided to the Court (Tr. 407-411). While the Court presumes the ALJ had Ms. Kendrick's responses before him when issuing his decision, the ALJ's failure to cite an exhibit containing those responses (Tr. 41) combined with the Commissioner's certification of a record that does not include those responses (Doc. 12) leads the Court to the inescapable conclusion that, as proffered here, "the vocational expert's testimony does not provide substantial evidence to support the administrative law judge's conclusion at step five of the sequential evaluation process." *Holtz v. Astrue*, 07-C-314-C, 2007 WL 5323758, at *6 (W.D. Wis. Nov. 8, 2007). "When a full and fair record is lacking, however, the ALJ will not have sufficient facts on which to make an informed decision, and thus his decision will not be supported by substantial evidence." *Clark v. Berryhill*, 402 F. Supp. 3d 541, 545 (W.D. Wis. 2019). *See also McDaniel v. Astrue*, 1:07-CV-642-SEB-TAB, 2009 WL 211861, at *3 (S.D. Ind. Jan. 29, 2009) ("Absent the ALJ's consideration and evaluation of the vocational expert testimony which was favorable to McDaniel's claim, the court cannot be confident that the ALJ considered the important evidence of record, nor can it trace the path of the ALJ's reasoning."). For this reason, the

---

[5] 42 U.S.C. § 405(g) provides, in pertinent part, that "As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based." While the Court presumes clerical errors are to blame for the apparent gap in the record, such that the Commissioner's certification was a mere oversight, other courts have approached this issue with additional skepticism and noted that "in the appropriate case, the Commissioner may be exposed to sanctions if she certifies as complete a record that plainly is not." *Acevedo v. Barnhart*, 474 F. Supp. 2d 1001, 1005 (E.D. Wis. 2007).

Court finds that the ALJ's decision at Step 5 is not supported by substantial evidence. Therefore, this case must be remanded to the Commissioner for further proceedings.[6]

While the above issue merits remand on its own, the Court also briefly addresses several of the arguments raised by Plaintiff related to how the ALJ weighed evidence and determined Plaintiff's RFC. Most notably, the ALJ rejected, or found non-persuasive, opinion evidence (*see* Tr. 38-40), medical evidence (Tr. 37-38), and subjective complaints (Tr. 36) that were contrary to his RFC determination by finding that the combination of Plaintiff's more limiting and less limiting evidence supported his RFC determination, but not further limitations (*see, e.g.,* Tr. 40).

RFC is an assessment of what work-related activities an individual can perform

---

[6] In addition, the Court notes that the blank vocational interrogatories posed to Ms. Kendrick do not include questions expressly inquiring as to available jobs when accounting for Plaintiff's mild mental limitations in: (1) understanding, remembering or applying information; (2) concentrating, persisting or maintaining pace; and (3) adapting or managing oneself (*see* Tr. 34 -35). And pertinently, the ALJ found the opinions of the reconsideration level state agency consultants to be persuasive as to Plaintiff's mild mental limitations (Tr. 35). Yet, the vocational interrogatories posed to Ms. Kendrick did not include a question that incorporated those specific mental limitations which the ALJ found to be persuasive (*see, e.g.* Tr. 401-405). Instead, at most, the ALJ's hypothetical included a limitation related to understanding, remembering or carrying out simple instructions in the workplace (Tr. 402).

Thus, the Court does not believe that the ALJ's posed hypotheticals adequately accounted for all of Plaintiff's mental limitations. The Seventh Circuit has "repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) (internal quotation marks and citation omitted). *See also Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (Expressing the same concern and then holding that "[b]eyond stating that Yurt could perform 'unskilled task[s] without special considerations,' the hypothetical does nothing to ensure that the VE eliminated from her responses those positions that would prove too difficult for someone with Yurt's depression and psychotic disorder."); *Mischler v. Berryhill*, 766 F. App'x 369, 376 (7th Cir. 2019); *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019); *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004). Thus, even if the Court had been provided with Ms. Kendrick's responses, it is not clear that her responses would have accounted for the concentration and other mental limitations found to be persuasive by the ALJ. *See Stewart*, 561 F.3d at 685 ("As a consequence, the vocational expert did not address these limitations when he suggested vocations such as punch-board assembler, laundry worker, or sorter.").

despite his or her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)). An individual's RFC should be assessed based upon all relevant evidence in the record. *Id.* However, the Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). In other words, an ALJ may not simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a contrary result. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Here, on no less than three occasions, the ALJ attempted to overcome evidence that would have supported a more restrictive RFC by stating:

> As discussed above, the claimant's diagnostic imaging; her normal and abnormal physical and mental examinations; her conservative treatment and lack of adherence to her prescribed treatment; the reports of her sister and mother; her subjective complaints; and her activities of daily living are consistent with a limitation to light work with the above postural, manipulative, environmental, and mental limitations (Hearing; Exhibit 6E; 8E; 1F/16/17/20; 2F/2/4/7/8; 4F/7/11; 5F/1/3/7; 8F/4/5/10).

(Tr. 39, 40). Quite simply, this lumping of evidence together provides the Court with no way of determining how the ALJ arrived at the conclusion he did. *See Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) ("Though an ALJ's credibility determination may only be overturned if it is 'patently wrong,' *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), a failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("If the administrative law judge believed the medical reports that found that

Sarchet has enough strength to work and disbelieved Sarchet's own testimony, this would compel the denial of the application for benefits. We cannot say that this combination of belief and disbelief would be unreasonable but we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Mueller v. Astrue*, 860 F. Supp. 2d 615, 619 (N.D. Ill. 2012) ("The ALJ need not build the Pont Neuf. A simple trestle will suffice so long as it allows the reviewing judge to traverse safely the divide between the evidence and the conclusions.").

In taking this approach, the ALJ did not actually explain why he did not find evidence supporting a more restrictive RFC to be persuasive. "An ALJ does not have to accept an opinion from a treating physician as long as the ALJ cites good reasons for rejecting it." *Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 882 (N.D. Ill. 2019). Here, for example, the ALJ rejected the opinion of Dr. Lakho by citing numerous pieces of favorable and unfavorable evidence together (Tr. 39). But by taking this approach and generally asserting that the "longitudinal record" does not support such severe restrictions, the ALJ failed to provide specific reasons for rejecting that evidence. And confusingly, in doing so, he even cited numerous pieces of evidence that support Dr. Lakho's more-severe limitations such as evidence of Plaintiff's subjective complaints, reports from her mother and sister, activities of her daily living that demonstrate she was reliant upon family to help her with even the most basic of tasks, and the multitude of medical records

documenting her MS and the resulting balance and gait issues she experienced (Tr. 39). *See, e.g.*, *Emanuele v. Astrue*, 803 F. Supp. 2d 959, 973 (E.D. Wis. 2011) ("As Emanuele argues, the same Exhibit is being used to show stability and worsening. The ALJ needed to discuss more which records showed stability and how, rather than referencing sixty-eight pages of records, some of which contradict a finding of stability."). Therefore, without further analysis or explanation, the ALJ has not built a logical bridge to explain why the conflicting evidence – when considered together – supports his RFC determination and not the more restrictive RFC determinations of the reconsideration level state agency consultants or Dr. Lakho. *See Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) ("The finding must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning.").

Relatedly, in citing Plaintiff's daily activities, even if the Court were to assume the ALJ found all of those activities demonstrated that additional limitations were not warranted, the Court questions how the limited evidence of Plaintiff's daily activities could support the ALJ's RFC determination and finding that Plaintiff could perform light work, standing for up to 6 hours in a workday. "It is obvious – or should be – that mowing the lawn one day out of a month with breaks over a two-hour period is not consistent with standing and walking for up to six hours every workday. Neither, of course, are sporadic chores around the house." *Michael C v. Saul*, 408 F. Supp. 3d 919, 924 (N.D. Ill. 2019). Likewise, here the Court struggles to understand how Plaintiff's daily activities,

such as microwaving food that her mother left in the microwave (Tr. 76) or doing laundry[7] are consistent with the ALJ's determination that Plaintiff could perform light work and stand and walk for up to six hours every workday. *See Id.* Certainly, some of Plaintiff's daily activities may support the ALJ's conclusion. However, instead of citing to those specific examples – the ALJ merely provided generalized conclusions and citations without further development.

Again, the Court will defer to the ALJ's decision if it is supported by substantial evidence, so long as the ALJ builds a logical bridge between that evidence and his conclusion so Plaintiff and this Court can trace his line of reasoning. *See Tracie H. v. Saul*, 388 F. Supp. 3d 990, 994 (N.D. Ill. 2019). But here, the ALJ's generalized citations and grouping of both favorable and unfavorable exhibits into one conflicting string citation do not provide a reasonable way for Plaintiff or the Court to understand the ALJ's reasoning. Accordingly, in addition to finding remand is required because of the issue

---

[7] Furthermore, when discussing Plaintiff's daily activities, the ALJ stated that Plaintiff was able to perform household chores including laundry (Tr. 34). The ALJ did not include a citation at the end of that sentence, but he did cite the entirety of the hearing testimony and Exhibits 6E and 8E at the end of that paragraph (Tr. 34). Having reviewed those exhibits and the hearing transcript, the Court is unable to find statements in those documents that support his assertion that Plaintiff can independently do laundry. No testimony was provided on this point at the hearing (Tr. 48-100). Moreover, while Plaintiff's answers in Exhibits 6E and 8E state that she does laundry (Tr. 329, 360), that statement was limited by Plaintiff's other responses in those exhibits. For instance, in Exhibits 6E and 8E, just before Plaintiff answered that she does laundry, Plaintiff answered that laundry was something she was able to do before her illness that **she could no longer do** (Tr. 330, 359) (For reasons unclear to the Court, page 5 of 10 in Exhibit 6E (Tr. 329) was filed before page 4 of 10 in Exhibit 6E (Tr. 330). However, this change in page order does not alter the Court's point). Additionally, later on in Exhibits 6E and 8E, Plaintiff answered that laundry was an activity **she did with others** (Tr. 332, 362). Thus, none of the exhibits or testimony the ALJ cited actually support his finding that Plaintiff was able to independently perform the household chore of doing laundry (*see* Tr. 34).

Admittedly, the ALJ never specified that he was treating that evidence as evidence that she was doing laundry *on her own*. Nevertheless, the Court assumes he made such an assumption because clearly, a claim that Plaintiff can work a job on her own for 8 hours would not be supported by evidence that Plaintiff can do some laundry at home when assisted by others.

related to the missing vocational interrogatory responses, the Court finds the ALJ's decision must also be remanded because it fails to build a logical bridge between the cited evidence and his conclusions.[8]

In summary, the Court holds that: (1) the ALJ's generalized citation of the evidence was not sufficient to provide a logical bridge between the evidence and his conclusions, and (2) in the absence of all of the Vocational Expert's testimony or filings, the ALJ's decision at Step 5 was not supported by substantial evidence. *See Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Accordingly, remand is proper so the ALJ can reconsider the evidence, develop the record, and provide a logical bridge between that evidence and his conclusions.

---

[8] Finally, the Court points out two additional concerns – without reaching a determination on those concerns - that it hopes the parties will consider on remand. First, the parties discussed (and disputed) whether the records show that Plaintiff's MS had progressed or exacerbated during the time period in question. Upon remand, the parties should keep in mind that evidence of Plaintiff's then-current level of impairment is more important than evidence of MS progression or exacerbation. *See Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) ("The fact that, according to her daughters, Wilder got worse in 1988 and 1989 does not indicate how bad she was in 1986."); *Milliken v. Astrue*, 397 Fed. Appx. 218, 225 (7th Cir. 2010) ("We recognize that the fact that Milliken's condition may have worsened at the time of the 2005 MS exacerbation does not compel the finding that she was not disabled prior to her date last insured.").

Second, the parties dispute the significance of Plaintiff's failure to consistently take MS medication and Plaintiff's purportedly inconsistent and/or conservative treatment plan. Certainly, the medical record contains several, potentially conflicting, explanations for why Plaintiff was not taking medication for her MS at all times (e.g., health insurance concerns, concerns related to which pharmacies carried specialty medications, side-effect concerns and issues regarding MS medication while pregnant and/or breastfeeding) (*see, e.g.*, Tr. 429, 437, 442, 447, 493). In considering this matter on remand, it would be beneficial for the parties to elaborate upon the differing explanations offered for Plaintiff's medication regime and course of treatment because some of those explanations could weigh against Plaintiff's claims while others might not. *See* SSR 16-3p; *see also Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) ("The ALJ may deem an individual's statements less credible if medical reports or records show that the individual is not following the treatment as prescribed…. However, such evidence should not negatively affect an individual's credibility if there are good reasons for the failure to complete the plan."); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("Here, although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.").

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled or that she should be awarded benefits. To the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

<u>CONCLUSION</u>

The Commissioner's final decision denying Plaintiff's applications for DIB and SSI is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** September 26, 2025

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**